597 P.2d 606

Gabriel ORTIZ, Jr., Claimant-Appellant,

v.

ARMOUR & COMPANY, Employer,

and

Department of Employment, Defendant-Respondent.

No. 12751.

Supreme Court of Idaho.

July 16, 1979.

Wayne P. Fuller of Fuller & Radke, Caldwell, for claimant-appellant.

Jeffrey L. Supinger of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for Armour & Co.

David H. Leroy, Atty. Gen., R. LaVar Marsh, Donald L. Harris, Deputy Attys. Gen., Boise, for defendant-respondent.

THOMAS, Justice, Pro Tem.

This appeal concerns the applicability of the Idaho Employment Security Law to the claimant-appellant, Gabriel Ortiz, Jr., who had been declared eligible for unemployment benefits under such law by an appeals examiner for the Department of Employment.

The appellant in his brief correctly outlines the course of this matter to this point and it is set forth as follows:

"Claimant was discharged from Armour & Company on November 29, 1976. He filed for benefits on December 1, 1976, and was declared ineligible for benefits by the initial claims examiner of the Department. The redetermination stage was by-passed and the matter came before the appeals examiner of the Department and a hearing was held on January 14, 1977. At the hearing, Mr. Ortiz testified but the employer, Armour & Company, did not have any person present to testify who observed or participated in the events of November 29, 1976.

Based on the testimony at the hearing the appeals examiner reversed the initial determination and awarded benefits.

Armour appealed the decision to the State Industrial Commission. A referee was appointed by the Commission to hear the matter and further testimony was taken from both parties at two hearings. A decision was issued which was approved and adopted by the Commission, which reversed the appeals examiner and held that the claimant was discharged for misconduct based on the legal conclusion, supported by the factual conclusions, that the protracted argument had occurred which included extreme profanity, yelling, and seeking to cause a fight."

For the reasons delineated hereafter we affirm the decision of the Industrial Commission.

The procedure for claiming benefits under the Employment Security Law, and the appellate procedure incident thereto, is set forth in I.C. § 72–1368. It should be noted that the final determination, before an appeal is made to this Court, is had by the Industrial Commission. The record of the proceedings before the appeals examiner becomes part of the record on review before the Commission and the Commission is not precluded in any way from receiving any additional evidence. Thus it is seen that hearings before the appeals examiner and before the Industrial Commission are in the nature of trials de novo since additional evidence can be presented at such hearings. The statute further indicates that the jurisdiction of this Court is limited to a review of questions of law. Under the authority of *In re: Pacific Nat. Life Assur. Co.*, 70 Idaho 98, 212 P.2d 397 (1949), where the evidence is presented without substantial conflict, a question of law is presented to this Court as to whether or not it will support the conclusion reached by the Industrial Commission. Since the evidence is not substantially in conflict as to the basic facts (the only conflict exists in the evaluation of the seriousness of the argument between the claimant and his employer) it would be appropriate to outline the evidence which was adduced at the respective hearings.

On November 29, 1976, claimant was working as a "knocker" on the "kill" floor of the defendant-employer's meat processing plant in Nampa, Idaho, on a shift that ended at midnight. Apparently the function of a "knocker" is to stun the animals as they commence their butchering process. They then are connected to a cable which takes them on to the processing line. The evidence developed at the hearings below indicated that prior to the incident which gave rise to the claimant's discharge, he had been observed by a fellow employee, who worked close to him, to have been drinking beer out of glass bottles, to have had at least two to four bottles, and to have thrown the bottles down the waste chute where the entrails and other parts of the animals which were not used for human consumption are ground up into animal feed. It also appears that after the first break allowed in his shift, the claimant had become injured when a horn he had thrown at a carcass bounced back and hit him in the nose. Whether these incidents were known to the employer prior to the time of discharge is not clear from the record; however, the record does disclose that previously the claimant had been reprimanded on one occasion for stabbing cattle in the rump, about which his supervisor had put a memo in his personnel file. Although the supervisor had no proof, he felt certain that the claimant had stabbed cattle in the nose on the night in question which if known would have caused the Humane Society to levy complaints against the employer. At approximately 7:00 p. m. on the night in question, the claimant was kicked in the face by a steer. Claimant testified that his immediate supervisor came by and asked him if he needed to go to the hospital and he said that he did not, that "I have been kicked worse, you know." The supervisor testified that he asked him if he wanted to go the hospital emergency room to see the closest available doctor. When the claimant declined, the supervisor later on at 8:30 p. m. went into the lunch room and asked him how he was, to which the claimant replied, "I am fine, no problem." Prior to this time claimant Ortiz pointed out to his supervisor a problem in the operation of the cable in the knocking chute, indicating that the cable needed to be replaced, or asking the supervisor "to check it out." The supervisor and a mechanic examined the cable, and found a frayed metal strand, which strand was taped. The supervisor indicated that the claimant asserted the cable should have been changed at dinner time and when it was not changed he told the supervisor he wasn't going to "knock any more cattle" until the cable was changed. The supervisor indicated he gave him a direct order to knock the cattle as they were going to continue the operation that shift. Shortly thereafter the supervisor observed some problem in the flow of cattle along the processing line and observed the claimant talking to the department steward or the union representative. The supervisor went over to see what was the discussion whereupon the claimant told the supervisor he was going home, that his nose hurt. The supervisor indicated that if he was injured he must see a doctor at the hospital. As he was speaking the supervisor pointed his finger in the face of the claimant whereupon the claimant said, "Don't tell me what to do, boy." The supervisor again instructed him to go to the hospital pointing his finger at the claimant. The claimant became enraged and began yelling in the supervisor's ear using extreme obscenities. Claimant testified that he hoped his abusive language would agitate the supervisor to the point that he would "swing at me." The Commission adopted the findings of the referee and found that the supervisor then turned to the shop steward and told the shop steward he was going to "fire" the claimant and that in so doing he would telephone the plant superintendent. The supervisor ordered Ortiz to remain at the plant until the plant superintendent arrived, but Ortiz left and went to the hospital. Near midnight he returned with a medical statement from the attending physician. He was ordered off the premises by the plant superintendent and informed that he had been fired for insubordination. Although at the hearing the supervisor testified that the claimant was discharged for yelling obscenities at

him and alleged misconduct committed prior to November 29, 1979, the referee found that the claimant was fired for his behavior solely on the latter date (which behavior was termed "insubordination" by defendant-employer). The referee further concluded that the discharge was not for failure to follow directions given the claimant by his supervisor, but the direct cause of the firing was loss of claimant's temper and extended yelling at the supervisor. The referee further concluded that such action by the claimant was misconduct within the definition of the appropriate statute.[1]

The misconduct which will disqualify a claimant from receiving unemployment benefits under the Employment Security Act and under specifically I.C. § 72–1366(e) is a ". . . disregard of standards of behavior which the employer has a right to expect of his employees." *Johns v. S. H. Kress & Company*, 78 Idaho 544, 548, 307 P.2d 217, 219 (1957). In *Avery v. B & B Rental Toilets*, 97 Idaho 611, 614, 549 P.2d 270, 273 (1976), the Court stated that an employer has a right to expect "that his employees will not engage in protracted argument" upon receiving an order. The referee herein concluded that Ortiz did engage in a "protracted argument" when he was told to report to the hospital if he was injured. It is axiomatic in Idaho that findings of fact made by the Industrial Commission in unemployment cases will be sustained on appeal if supported by substantial and competent evidence. *Weston v. Gritman Memorial Hospital*, 99 Idaho 717, 587 P.2d 1252 (1978).

In the *Avery* case this Court indicated that it is not necessary for an employee to attain ". . . a standard of unswerving docility and servility . . . [a] single incident of comparatively nonserious disrespect by complaining and arguing is not misconduct." *Supra*, 97 Idaho at 615, 549 P.2d at 274.

Appellant has indicated, and cites authority to support the proposition, that an essential element of misconduct is *culpability* or *fault*, and that this would not include poor judgment or inadvertence; hence, a single incident of a remark is merely an error of judgment. Accepting that proposition to be true, the record in this case would seem to indicate that claimant's conduct was more calculated than inadvertent; even claimant's testimony before the appeals examiner was in this vein:

"... he (was) . . . telling me I was going too slow, you know, and I says well I don't feel good, you know, and I'm working as fast as I can and besides I'm not behind and he just kept on telling me that I was going too slow and I was in pain and he didn't believe me. He just kept saying that was two hours ago. Finally he says, well you're no good to me here so you'd better go to the hospital so that's exactly what I did. And I says I will . . . *I shouted it you know*, I said well, I well, you know, not in that tone, *in a very bad tone of voice*. Anyway, right then just for that instance he stopped he said you're fired first, and I started cussing in his ear." Tr. p. 4 (Emphasis added.)

It would seem clear that an employer should at least be able to expect an employee to refrain from screaming profanities into the ear of his supervisor and trying to provoke him to fight when, as the referee concluded, "claimant deliberately refused to continue working when instructed to do so by his supervisor. Further, claimant initially balked when told he should go to the hospital if he is hurt. These were reasonable directives given by his supervisor, and the company was entitled to have them obeyed." It is the conclusion of this Court that the claimant did violate the standards which his employer had a right to expect of him at this time.

---

1. "The personal eligibility conditions of a benefit claimant are that . . .

(e) His unemployment is not due to the fact that he has left his employment voluntarily without good cause, or that he was discharged for misconduct in connection with his employment." I.C. § 72–1366(e).

Claimant points out by way of exhibit offered during the hearing, that under company rules and policy claimant should only have been suspended for one week and not discharged. A review of the exhibit indicates that it consists of 31 rules of conduct for the guidance of the employees. There is a page of instruction to the management as to how violations of the work rules should be handled. The exhibit clearly indicates that a violation of any rule will result in appropriate disciplinary action. Rule 23 lists "insubordination, including the use of profane, abusive or threatening language toward fellow employees, supervisors, or officials of the company." The exhibit indicates that violation of work rules 20 through 27 should carry a penalty of first a one week's suspension and second, discharge; however, there is a further comment as follows:

"There will be cases where violations of work rules 28 through 36 will warrant discharge, depending upon the seriousness of the particular case involved. To some extent your past practice and you should handle accordingly depending upon the facts of each individual case. [sic] This also applies to the violations of some of the work rules 23 through 27, but to a lesser extent."

Even under the rule it would seem that the company, under serious circumstances, can summarily discharge an employee.

In light of our decision, we need not comment on claimant's request for attorney's fees.

The decision of the Industrial Commission denying claimant unemployment benefits is affirmed.

SHEPARD, C. J., DONALDSON, J., and SWANSTROM, J., Pro Tem., concur.

BISTLINE, Justice, dissenting.

The decision of the Department appeals examiner should be reinstated unless the Court retreats from the rule of that line of cases[1] which classified the "misconduct" of I.C. § 72–1366(f) into at least two categories.

That the claimant was guilty of certain inelegancies of expression there can be no doubt. Equally doubtless is that the employer, notwithstanding its own rules, had the right to discharge him where, as here, there is no contention that the company's rules were any part of an employment contract.

The facts attendant to the claimant's discharge are well stated in the Court's opinion, and the sole question is whether claimant, by reason of the conduct portrayed there and which cost him his job also deprived him of unemployment benefits.

This controversy needs to be decided in context, and the context is a meat-packing plant where the claimant served his employer in a capacity for which the sensitive or faint-hearted need not apply. That the claimant was given to the use of obscenities in expressing himself in the argument with his supervisor, especially after being kicked in the face by a steer, or that he was quite willing and desirous to engage in a brawl after having a finger pointed in his face, somehow is neither surprising nor shocking. In other contexts (where offensive language was used in the presence of customers or the public) this conduct would necessarily have to be viewed differently, but here, as a matter of law, I do not think it should be held that such conduct was violative of any interest of the employer, which, after all, is the test to be applied. In so stating, I confine myself to the reasons which were advanced for the discharge, eschewing from consideration the drinking of beer, improper disposal of the bottles, bouncing a horn off a carcass, and suspicion of nose-stabbing.

---

1. Apparently beginning with *Johns v. S. H. Kress & Co.*, 78 Idaho 544, 307 P.2d 217 (1957), affirmed in *Wroble v. Bonners Ferry Ranger Station*, 97 Idaho 900, 556 P.2d 859 (1976).