683 P.2d 415

**Mikell J. BULLOCK, SSA 518–38–9537, Claimant-Appellant,**

v.

**CIT CO. FEDERAL CREDIT UNION, Employer-Respondent,**

and

**State of Idaho, Department of Employment, Respondent.**

**No. 14812.**

Supreme Court of Idaho.

May 29, 1984.

Ronald S. George, Pocatello, for claimant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Carol Lynn Brassey, and Larry F. Weeks, Deputy Attys. Gen., State of Idaho, for respondent State.

David Maguire, Pocatello, for employer-respondent CIT.

SHEPARD, Justice.

This is an appeal from the Industrial Commission's denial of claimant's application for unemployment compensation. The commission found that claimant had acted in wilful disregard of the interest of the employer and that claimant was terminated for misconduct. We affirm.

Misconduct under I.C. § 72–1366(e) has been defined as "wilful, intentional disregard of the employer's interest; a deliberate violation of the employer's rules; or a disregard of standards of behavior which the employer has a right to expect of his employees." *Johns v. S.H. Kress & Company,* 78 Idaho 544, 548, 307 P.2d 217, 219 (1957); *accord, Parker v. St. Maries Plywood,* 101 Idaho 415, 614 P.2d 955 (1980); *Ortiz v. Armour & Co.,* 100 Idaho 363, 597 P.2d 606 (1979). *See also Avery v. B & B Rental Toilets,* 97 Idaho 611, 549 P.2d 270 (1976).

The essence of claimant's argument upon appeal is that the commission erred in certain of its factual findings, specifically, in its findings that the person giving claimant an "order" had authority to supervise claimant; that claimant refused to obey the order; and that claimant's refusal was an action in wilful disregard of the interest of the employer.

Claimant worked for eleven years at CIT Company, a federal credit union which employed only one person, the claimant, as a full-time employee. At the time of her termination, claimant was manager of the credit union and, as such, was responsible for the company records and books.

In March of 1981, a federal examiner had audited the company's books and found numerous deficiencies. The examiner rated the company as a "4" on a scale of one to five, with one being the best rating and liquidation following from the receipt of a five rating. The examiner said that the problems discovered in the audit were capable of correction and hence he rated the company a four instead of a five, but he also said that he would conduct another audit shortly to determine if the deficiencies had been corrected.

The office of the credit union was to be closed for the first two weeks in July to allow claimant to close out the books. In previous years during such book closure period, claimant had worked nights, and she followed that practice in July 1981. On the night of July 5, claimant worked from 11:00 p.m. until 6:30 a.m.

Credit unions receive no advance warning of audits by federal examiners. On July 6, the examiner decided to conduct his audit, but he found the office closed. The federal examiner called the president of the board of directors of the credit union, who in turn called the claimant. A discussion ensued between claimant and the president, and the testimony reflects differing versions of that discussion. The commission found that claimant had violated a direct order from the president in refusing to open the office to the federal examiner.

The board of directors of the credit union met and voted to discharge the claimant, giving four reasons therefor. Only one of these reasons, i.e., claimant's failure to open the credit union on July 6, was found by the commission to justify the action of the board.[1]

■■■ It is axiomatic that Industrial Commission's findings of fact are entitled to deference and will not be overturned absent a clear abuse of discretion. *Parker v. St. Maries Plywood, supra; Guillard v. Department of Employment,* 100 Idaho 647, 603 P.2d 981 (1979); *Bentley v. Bunker Hill Co.,* 100 Idaho 571, 602 P.2d 69 (1979). *See* Idaho Const. art. 5, § 9. We hold that the commission's finding that the president of the board of directors had informally been given supervisory authority over the claimant is substantially supported by the testimony in the record here. We further hold that the testimony before the commission is sufficient to support the finding that claimant refused to carry out the direct order of Nate Palagi, the president of the board of directors, instructing

---

1. "The Referee agrees with the claimant that the president technically had not been delegated the authority to direct the claimant to open the office. However, consideration of the matter does not end there. The Referee finds that the following circumstances are particularly relevant: an audit was conducted in March by a federal examiner who found serious deficiencies in the operations of the credit union; the examiner notified the credit union that he would conduct another audit in the future to determine if the deficiencies had been corrected; if the deficiencies were not corrected, the credit union could be liquidated; audits must be conducted without prior notice so that the books are not altered; and the claimant was aware of the importance of establishing a good rapport with the examiner. These circumstances establish overwhelming reasons for opening the office for the examiner. The claimant's failure to open the office or arrange for it to be opened after two requests from the president of the board was a wilful disregard of the employer's interests and a disregard of the standards of behavior an employer has a right to expect of its employees. Therefore, the claimant's unemployment is due to the fact that she was discharged for misconduct in connection with her employment, so she is not eligible for unemployment benefits."

claimant to open the office for the federal examiner.[2]

Under the circumstances, as noted by the findings adopted by the commission, there existed necessitous reasons for opening the office for audit by the federal examiner; to not cooperate with the auditor was conducive to a risk of liquidation of the credit union. Hence, we hold that the commission's finding that the claimant acted in wilful disregard of the interest of the employer is sustained.

The decision of the Industrial Commission is affirmed. Costs to respondent CIT Co. Federal Credit Union. No attorneys' fees allowed on appeal.

DONALDSON, C.J., and BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

## I.

The Court's opinion is completely oblivious of *Comegys*.[1] In that case the main issue on appeal was whether or not the claimant's conduct, in that case the writing of NSF checks, brought discredit to the Air National Guard. The Commission ultimately concluded that it did not, and hence was not misconduct. The employer's contention here is that claimant's alleged refusal to open the door for the federal auditor somehow jeopardized the existence of the credit union of which claimant had been for ten years the manager and entire labor force. DOE's claims examiner and its appeals examiner both were persuaded by that argument. In turn, the referee of the Industrial Commission bought the same argument—notwithstanding that at that level the DOE took part in proceedings through the person of one of its regularly retained counsel. Counsel for the DOE argued to the referee that on the facts and on the law both the initial claims examiner for the DOE and its appeals examiner, were in error.[2] In turn, members of the Commission, not including the member selected as being labor-oriented, adopted as the Commission's, the proposed findings, conclusions and order of the referee—denying benefits.[3]

The referee-Commission decision was based upon the referee's findings, and the case law of the 3–2 decision in the earlier

2. "Q. ... Okay, at any rate, as I understand it, Mr. Palagi, whom you knew to be the president of the board of directors of the CIT Co Federal Credit Union, called you up on July the 6th, 1981, and asked you to go down and open up the CIT CO Federal Credit Union for the purpose of allowing the federal examiner to go down and examine the books, isn't that correct?
"A. That's right.
"Q. And you refused to do that?
"A. I gave him reason why I did not want to go down.
"Q. Could the witness be instructed to answer the question?
"A. Yes, I did.
      \*     \*     \*     \*     \*     \*
"Q. [The federal examiner] called the President of the Board of Directors?
"A. He called several people.
"Q. Let's zero in on Mr. Palagi. He called Mr. Palagi, did he not?
"A. Yes, he did.
"Q. And Mr. Palagi in turn asked you to open up the doors to the credit union?
"A. Yes, he did.
"Q. And you refused?
"A. That is correct."

1. *Comegys v. Idaho Air National Guard,* 104 Idaho 767, 663 P.2d 648 (1983). On remand the Commission entered an order for benefits to Mr. Comegys. A copy of their final and unappealed decision is attached hereto as Appendix A.

2. Long before I sat on this Court, and since then, it has been many times explained that legal counsel for the DOE maintains a hands-off policy during the processing of a claim. The many, many claims are handled administratively; staff counsel make no effort or attempts at guiding those administrative decisions. Only when a claim reaches the appellate level before the Commission do counsel ordinarily begin to participate, and later, of course, on any further appeal to this Court.

3. The order recites that the Commission had reviewed the record, as well as the drafted decision of the referee. As to appealing, on October 27, 1982, counsel for claimant ordered a transcript of proceedings which were had before the referee. The transcript was not transcribed and filed with the Industrial Commission until January of 1983. Such raises a question as to what the Commission had reviewed in the previous October.

case of *Johns v. S.H. Kress & Co.,* 78 Idaho 544, 307 P.2d 217 (1957), which case was quoted from, apparently accepted as the gospel in defining the type of conduct which will work a denial of benefits. This appeal followed.

In due time briefs were filed by counsel for claimant, by counsel for the DOE, and by counsel for the employer. Counsel for DOE argues, as did claimant, that the Commission's findings were not substantiated by the evidence, and that the findings did not support the conclusion and denial of benefits. That the Department's view of the case sides with claimant's, proved to be a perplexity to some members of the Court, and may have actually prejudiced the claimant's case. The colloquy between the bench and DOE counsel sheds enlightenment on the possibility, and also on the probability that the Commission may not have had the benefit of the testimony taken by the referee at the time the latter's decision was adopted as the Commission's. For that reason the colloquy is attached hereto as Appendix B.

A first inclination was to vote to vacate the decision of the Commission and remand in order that the argument which we heard could be presented to the Commission as a prerequisite to this Court hearing it for the first time, which would also take care of the problem also present, if the Commission in fact did not have a complete record when it acted. On reflection, however, and there being at least a scintilla of doubt in that regard, because it is so readily ascertainable that the Commission's decision cannot stand on the grounds urged by claimant and by the DOE, it seemed the better course to decide the case on the merits, resolving due process questions in favor of presumed regularity—as suggested by counsel for the employer.

## II.

Commission findings of fact II, VII and VIII are not supported by the evidence.

Idaho Code § 72–1366(e) provides that a benefit claimant shall be eligible for unemployment benefits provided that "his unemployment is not due to the fact that he left his employment voluntarily without good cause, or that he was discharged for misconduct in connection with his employment."

The question of whether a claimant meets the eligibility requirements of the Employment Security Law is a question of fact for determination by the Industrial Commission. *In Re Walker's Claim,* 80 Idaho 420, 332 P.2d 199 (1958). The scope of review by this Court is limited to a determination of the applicable law and whether the findings of fact are supported by substantial and competent evidence. *Idaho Constitution,* Article V, Section 9; *Gaehring v. Department of Employment,* 100 Idaho 118, 119, 594 P.2d 628 (1979); *Simmons v. Department of Employment,* 99 Idaho 290, 581 P.2d 336 (1978); *Booth v. City of Burley,* 99 Idaho 229, 580 P.2d 75 (1978). See also Dissent of Bakes, C.J., in *Davenport v. State, Department of Employment,* 103 Idaho 492, 650 P.2d 634 (1982).

In Finding of Fact Number II., the Industrial Commission found that "... Informally, the board members also gave the president authority to supervise the claimant in the day-to-day operation of the credit union." (R. page 12) The Respondent, Department of Employment, would argue that this portion of Finding Number II. is not supported by substantial and competent evidence within the record of this matter.

Charles Gilmore, a member of the Employer's Board of Directors, under cross-examination by the Claimant's counsel, stated:

"Q. And who, basically, runs the day-to-day operations of the credit union?

A. Business Manager.

Q. Which was Mrs. Bullock at that time, is that right?

A. Correct." (Tr., Vol. II., p. 11, ll. 11–15)

The Claimant testified at the hearing before the appeals examiner that she was allowed a great deal of discretion in manag-

ing the day-to-day operations of the credit union. (Tr., Vol. II, p. 53, ll. 30–33) This would not be a surprising situation given that the undisputed fact was that the claimant had been employed by the credit union for 11 years. (Tr., Vol. II., p. 52, l. 33)

Further, there was testimony at the hearing before the Industrial Commission that nothing in the adopted bylaws of the Credit Union specifically authorized the president to have any supervisory authority over the claimant in regard to the operation of the credit union. (Tr., Vol. I, pp. 15–22; Exhibit 12)

The above-noted portion of Finding II is therefore not supported by substantial and competent evidence introduced at the hearing in this matter and should be reversed by this Court.

The Commission also found in Findings VII and VIII that the claimant refused to open the credit union for the federal examiner, who had arrived at the credit union building on the morning of July 6, 1981. (R. p. 14)

The record reflects, however, that there was no direct refusal by the claimant to allow the examiner into the building as would be inferred from reading the above-noted findings. The then president of the credit union, Nate Palagi, testified before the appeals examiner, under cross-examination, as follows:

"Q. Okay, isn't it true that your conversation with her got to the point .. only to the point that she was questioning whether or not it was proper .. under proper procedures of the credit union, to let the auditor in during the time when the credit union was closed?

A. Yes.

Q. And that you ... and it's also true that you didn't provide her with any basis, other than your own feeling that it should be opened? I mean you didn't tell her so and so says so, or it's law, or anything else?

A. No." (Tr., Vol. II, p. 40, ll. 31–36; p. 41, ll. 1–5)

A review of the testimony regarding the critical telephone conversation on July 6, 1981, would indicate that there was more of a discussion between the president and the claimant regarding the propriety of her leaving her home and going down to the credit union business office in order to simply open the door to allow the federal auditor onto the premises.

The above-noted portions of the Findings by the commission are not supported by the evidence in this matter and should be reversed by this Court upon appeal.

III.

THE COMMISSION HAS INCORRECTLY APPLIED THE LEGAL STANDARDS TO THE EVIDENCE WHICH IS SUPPORTED BY THE RECORD IN THE INSTANT CASE.

In Conclusion of Law Number IV., the Commission states that "... The referee agrees with the claimant that the president technically had not been delegated the authority to direct the claimant to open the office ..." However, the Referee then makes the conclusion that, because of the circumstances involving the importance of the federal audit, that those circumstances "... establish overwhelming reasons for opening the office for the Examiner. The claimant's failure to open the office or arrange for it to be opened after two requests from the president of the board was a willful disregard of the employer's interests and a disregard of the standards of behavior an employer has a right to expect of its employees ..." (R. pp. 17, 18)

The standards which have been consistently followed by this Court in regard to employment-related misconduct have been announced to be the willful, intentional disregard of the employer's interests; a deliberate violation of the employer's rules; or a disregard of the standards of behavior which the employer has a right to expect of its employees. *Wroble v. Bonners Ferry Ranger Station*, 97 Idaho 900, 556 P.2d 859 (1976); *Oliver v. Creamer Heating & Appliance Co.*, 91 Idaho 312, 420 P.2d 795 (1966); *Watts v. Employment Security*

*Agency,* 80 Idaho 529, 335 P.2d 533 (1959); *Johns v. S.H. Kress & Co.,* 78 Idaho 544, 307 P.2d 217 (1957).

There is no requirement in the definition of misconduct that the disregard of the standards of behavior must be found to have been subjectively willful, intentional or deliberate. Rather the test for misconduct in standard of behavior cases is (1) whether the employee's conduct fell below the standard of behavior expected by the employer, and (2) whether the employer's expectation was objectively reasonable in the particular case; the employee's subjective state of mind is irrelevant. *Matthews v. Bucyrus-Erie Co.,* 101 Idaho 657, 619 P.2d 1110 (1980).

The Commission, in this matter, clearly refers to the *Johns* case in its Conclusion of Law Number III. (R. p. 17). All three Counsel at the Industrial Commission hearing in this matter appear to have alluded to the standard of behavior aspect of that case in their closing arguments. Attorney for the Respondent, Department of Employment, argued that in this particular case the standard of behavior was basically established by the claimant herself due to the broad discretion that she had been given by the board of directors to conduct the day-to-day business activities of the credit union. Counsel for the Respondent, Department of Employment, further argued that there was no evidence at either hearing that there was any deliberate violation of any standards, and that the claimant had simply been exercising her legal discretion in not agreeing to immediately go down to the credit union to open the doors for the federal examiner.

The Respondent, Department of Employment, would still maintain that the entire controversy appeared to be an isolated incident involving perhaps ordinary negligence or a good faith error in judgment on the part of the claimant, but that such behavior certainly did not fulfill the standards indicated by this Court in the *Johns* case.

It seems to be clear from the record that it was not of any great importance that the claimant herself be present when the feder-al auditor was at the office to examine the books. Clearly the books were kept at the office. The president of the credit union testified under direct examination of the Appeals Examiner as follows:

Q. "Where were the books kept that the auditor wanted to review?

A. At the credit union.

Q. Those books were there on the 7th when it was opened for the auditor to review the books, is that correct?

A. Yes.

Q. They were not at the claimant's home, where she was?

A. No." (Tr. Vol. II, p. 44, ll. 16–23)

Further under cross-examination by counsel for the employer, at the hearing before the Industrial Commission Referee, the claimant testified as follows:

"Q. You refused to open the doors to allow him to examine the books?

A. I refused to go down to the office. If Mr. Palagi wanted Mr. Sinclair in, Mr. Palagi had the keys to the office, all of the keys. Mr. Palagi's wife was the clerk and if Mr. Palagi thought it was so terribly important he could have had his wife go down, who also had a complete set of all the keys.

Q. Well, that in fact is what happened, is it not? Mrs. Palagi went down and opened—

A. Mrs. Palagi went down on the 7th.

Q. And you were the business manager?

A. That is right.

Q. So it was your responsibility to assist the examiner in performing his audit, was it not?

A. Not necessarily. He knew where all of the books were. He knew what he had to see. He knew where they were. When they examine you they are not in the same room when they are examining books anyway." (Tr. Vol. I, p. 44, ll. 22–25; p. 45, ll. 1–15)

The claimant further testified at the hearing before the Industrial Commission Referee that any of the employees of the credit union or the president could afford

the auditor the information he required to perform the audit, and, in fact, this was accomplished by Mrs. Palagi (Tr. Vol. I, p. 53, ll. 2–23)

The claimant further testified that there was no responsibility nor was any assistance requested normally to provide input to the auditor during the performance of an audit (Tr. Vol. I, p. 54, ll. 8–19). The claimant also testified that the only service she could perform at the request of the president on July 6, 1981, would have been to physically open the door which was, in fact, performed by another employee (Tr. Vol. I, p. 55, ll. 10–12). Further that there was no problem with another employee opening the door for the auditor, that employee, in fact, was Mrs. Palagi, who was supervised directly by the claimant in this matter (Tr. Vol. I, p. 58, ll. 6–21).

## IV.

The majority opinion sets forth in its footnote 2 the testimony of claimant[1] which is said by the majority to sustain the finding "that claimant refused to carry out the direct order of Nate Palagi, the president of the board of directors, instructing claimant to open the office for the federal examiner." The excerpt in footnote 2 concludes with this:

"Q. And Mr. Palagi in turn asked you to open up the doors to the credit union?

"A. Yes he did.

"Q. And you refused?

"A. That is correct."

Putting aside the not-insignificant fact that a "request" is not the equivalent of a direct order, my larger concern is that claimant and her counsel will see the Court's selective isolation and then conjunction in sequence of these two particular bits of her testimony as perhaps being on the unfair side. Her testimony before the referee did not conclude at that point; the majority opinion's excerpt properly should have continued on. Moreover, to appreciate her testimony in context, that which preceded the

isolated excerpt must also be noted. Keeping in mind that claimant had worked on the books all night the night of July 5 and morning of July 6, and also two previous nights—the Fourth of July intervening— the following more completely sets forth her cross-examination testimony before the Commission referee:

"Q. And the fact is that it wouldn't have been any problem to have opened the doors to Mr. St. Clair, would it?

"A. Yes, it would have.

"Q. Why is that?

"A. Because I was tired, I had worked all night the night before.

"Q. Well, the Board of Directors didn't require you to work all night, did they?

"A. They required me to do the job.

"Q. They required you to close the books and they provided the business would be closed so you could do that during the regular business hours?

"A. No, they did not.

"Q. You chose to work at night; isn't that a fact?

"A. They knew I worked at night.

"Q. Well, but they did not require you to work at night, you could have worked during the day?

"A. That is right.

"Q. And the fact is that during that week you let people in to transact business, didn't you?

"A. Only on the first day, an emergency.

"Q. But the fact is that you allowed people in there during the time it was supposed to be closed?

"A. It was an emergency, people were allowed to transact business with the credit union.

"Q. And you were more than willing to open the credit union to customers of the credit union?

---

**1.** The excerpt in the majority opinion is in two parts. Only the second part was testimony before the referee, Mr. Paddock; the first portion was some ten months earlier before Nadine Brown, the Department's appeals examiner.

"A. I was at the office when they arrived.

"Q. And you transacted business for those persons?

"A. Because they had called to make provisions.

"Q. Mr. St. Clair had called to make provisions?

"A. Mr. St. Clair had never called me to make any provisions.

**"Q. He called ·the President of the Board of Directors?**

**"A. He called several people.**

**"Q. Let's zero in on Mr. Palagi. He called Mr. Palagi, did he not?**

**"A. Yes, he did.**

**"Q. And Mr. Palagi in turn asked you to open up the doors to the credit union?**

**"A. Yes, he did.**

**"Q. And you refused?**

**"A. That is correct.***

"Q. And the reason you gave was because you didn't have to?

"A. I told him that I was tired and it was not· necessary that Mr. St. Clair come in at that time to audit the books.

"Q. Well, the purpose of the audit was to determine—

"A. The books were not even closed at that time.

"Q. Well, that wasn't the importance for Mr. St. Clair's visit was it though?

"A. He had to examine those books ·for that closing, yes.

"Q. He had to examine the books to determine whether or not the deficiencies previously noted had been corrected?

"A. If you will notice in his report he examined through July 31st.

"Q. I would like to have an answer to my question: The fact is that he was there to perform an audit.

"A. That is correct.

"Q. And you were expected to be working during that week?

"A. No, I was not expected to be working during that week. I was expected at my convenience to have the office closed to close the books at my convenience.

"Q. And the President of the Board of Directors called you up and said the federal auditor is here to examine the books and records of the CIT Co Federal Credit Union, and you refused?

"A. I told him we did not have to go down and open that office right then for Mr. St. Clair.

"Q. You refused to allow him to go in?

"A. I did not refuse Mr. St. Clair to go in.

"Q. You refused to open the doors to allow him to examine the books?

"A. I refused to go down to the office. If Mr. Palagi wanted Mr. St. Clair in, Mr. Palagi had the keys to the office, all of the keys. Mr. Palagi's wife was the clerk and if Mr. Palagi thought it was so terribly important he could have had his wife go down, who also had a complete set of all the keys.

"Q. Well, that in fact is what happened, is it not, Mrs. Palagi went down and opened—

"A. Mrs. Palagi went down on the 7th.

"Q. And you were the Business Manager?

"A. That is right.

"Q. So it was your responsibility to assist the examiner in performing his audit, was it not?

"A. Not necessarily. He knew‧ where all of the books were, he knew what he had to see, he knew where they were. When they examine you they are not in the same room when they are examining books anyway.

"Q. You were responsible to the Board of Directors?

"A. That is right.

"Q. And to nobody else?

---

* Bold print is the isolated excerpt set forth in the    majority opinion.

"A. The Board of Directors.

"Q. The President of the Board of Directors had no authority—

"A. The President of the Board of Directors under the Federal Credit Union By-laws, Act, rules and regulations had no power other than what is given him by the Board of Directors. The Board of Directors had not given Mr. Palagi any power to supervise me, so, no, he did not have authority to tell me to go down and open the office when the office was in fact closed for my convenience to do something that he wanted. He did not have that power or authority.

"Q. Show me where in the Bylaws Mr. Palagi did not have the authority as President of the Board of Directors.

"A. I think we've entered all those into evidence.

"Q. Show me where it specifically says that the President does not have the authority to give you instructions.

"A. Okay. It is on Page 6, Section 6: 'The Board may employ a manager who shall not be a member of the Board and who shall be under the direction and control of the Board or of the treasurer as determined by the Board. The manager may be assigned any or all of the responsibilities of the treasurer described in Section 5 of this article.'"

Tr., pp. 41–46 (bold type indicates the excerpt in footnote 2 of the majority opinion).

The majority opinion, notwithstanding the foregoing, makes the statement that "the testimony before the Commission [referee] is sufficient to support the finding that claimant refused to carry out *the direct order* of Nate Palagi, the president of the board ...." If there is such a finding by the referee [Commission], I am unable to locate it. Consonant with the testimony there was a request, Finding VII, and, after Mr. Palagi conferred with the credit manager of FMC for advice, there was a second request. Finding VIII. And, upon claimant's refusal of the second request, Mr. Palagi rather simply ended the supposed crisis by sending his wife down to let

the federal examiner into the office. The claimant may well be disturbed to have this Court turn her explained refusal of a request into disobedience of a direct order. Counsel for the employer was candidly very forthright in not even arguing such a contention:

"It is therefore respectfully submitted that based upon the fact that the president of the Board of Directors, Nate Palagi, asked the Claimant to open the Credit Union doors for the Federal Examiner; and the finding of the Commission that the president had authority to make such a request to the Claimant, such request being refused by the Claimant; and it being acknowledged by the Claimant that it is important for the benefit of the Credit Union for the manager to establish a good rapport with the Federal Examiner; the Commission could have rightfully concluded that the Claimant on the date in question had willfully and intentionally disregarded the best interests of the employer and deliberately violated a direct order from the employer.

"Interestingly, however, the Commission did not feel it to be necessary to make such a conclusion of law based upon this finding of fact. Nevertheless, the Respondent, Citco Federal Credit Union, respectfully requests that this Court conclude that based upon the finding that the president had authority to supervise the Claimant in the day to day operation of the Credit Union, such finding being based upon substantial and competent evidence, that the Claimant was therefore discharged for misconduct in connection with her employment." Employer's Brief, pp. 10–11.

Which brings us down to the issue which the parties have addressed at length, to wit, and putting aside the fact that "request" does not equal "direct order"—Did Mr. Palagi have the authority to direct claimant to let in the federal examiner? If he did not, and if either Mr. Palagi or Mrs. Palagi had keys and could have opened up instead of harassing a tired, sleepless

claimant into doing it, the employer cannot continue to prevail.

It is for the employer to prove that the employee was, in fact, discharged for employment related misconduct.[2] *Parker v. St. Maries Plywood,* 101 Idaho 415, 614 P.2d 955. Therefore, it obviously would be CIT CO's burden of proving that in the first instance, Mrs. Bullock's failure to go down and open the office was a violation of any reasonable work rule. In addition, as earlier referred to, Mrs. Bullock, at this point of time, said she had a phone call from another board member, Paula Neal, and she was told by Paula Neal that she did not have to go open the door that morning.

The Industrial Commission, in Finding of Fact Number IV. stated:

"The referee agrees with the claimant that the President technically had not been delegated the authority to direct the Claimant to open the office."

With this in mind, several things need to be pointed out. Mrs. Bullock testified several times that her discussions with Nate Palagi never got past the point of discussing whether or not it would be proper to open the door at that time. If that was, in fact, the case, then Mrs. Bullock did not even refuse a request by Mr. Palagi.

During the hearing before the Department of Employment, Mr. Palagi was asked the following:

"That's part of it. Also, I would .. I am going to attempt to show that there was more or less a misunderstanding and it never got to the point of any disobedience, but they were discussing whether it was even proper to open it up .. I think that's why my question needs to be answered. He has already testified that he told her to open up and she said no ... I'm going to the question that that is, in fact, what happened.

EXAMINER: Okay, on that basis I am going to continue the line of questioning. Q. Okay, isn't it true that your conversation with her really got to the point .. only to the point that she was questioning whether or not it was proper .. under proper procedures of the credit union, to let the auditor in during the time when the credit union was closed?"
To which Mr. Palagi responded, "Yes." (Dept. of Employment Tr., Pg. 40, Lns. 22–36).

Mr. Palagi was CIT CO's witness, called by them and he clearly admitted that the two conversations he had with Mrs. Bullock never got beyond the point of discussing what proper procedures would be and never got to the point of disobedience.

It is clear from a review of all of the testimony that Mrs. Bullock was charged with managing the day-to-day operation of the Credit Union and, as such, it normally would have been her sole decision concerning opening the door. The most that could be said about her conversations with Nate Palagi and Paula Neal would be that they had a discussion and disagreement about proper policies and, in fact, Paula Neal was in agreement with Mrs. Bullock.

*The Industrial Commission somehow seems to go beyond this and make a finding that the decision whether or not to open the door that morning might have some serious consequences to the Credit Union.* The only testimony concerning whether or not the Credit Union should even be opened up for the auditor while it was closed for business came from Nate Palagi when he stated he had talked to two people and they said it should be opened up. He identified these two people as Joe Garcia and Lois Larsen. Mrs. Bullock testified that after she found out the names of these people, she also went and talked to them because she was obviously desirous of finding out if she was mistaken in her

---

**2.** Because dissenting opinions are not head-noted, and because over one thousand attorneys have been admitted in the past five years, it may be well to consider the advent of *Johns v. S.H. Kress & Co.,* 78 Idaho 544, 307 P.2d 217 (1917).

A history and a review of *Johns v. Kress* will be found in the majority and dissenting opinions in *Jenkins v. Agri-Lines Corp.,* 100 Idaho 549, 553, 602 P.2d 47, 51 (1979). It is recommended reading.

views. Her testimony in that regard is as follows:

"A. Yes, I did .. yes, I did. The two people that Nate contacted happened to be serving on the same board as I do .. it's the chapter board, Idaho Credit Union League .. and Joe had asked me what had come of that, and I said what Nate had presumed to say, and I said, "Why did you tell him that we had to open the office." He said, "I was under the impression that you were in the office working and refused to let Mr. Sinclair in." Lois Larsen, who is manager of Garrett's Federal Credit Union stated that Nate had asked her about this, and she said we have never run into this problem because, even though we're on a computer .. it's kind of an EDP, batch-type .. they don't have to do it themselves .. that they had never found the need to close, and the fact .. I also asked Nate, I said, well, are you aware, too, that she has five full-time employees." (Dept. of Employment Tr., Pg. 77, Lns. 7–20).

When this conversation is taken in conjunction with that of Mr. Palagi, it was very apparent that it is still an unanswered question whether or not proper procedures would require that the Credit Union be opened for the examiner during the period of time that it was closed for business. Since CIT CO is alleging Mrs. Bullock acted improperly then it would be their burden to prove that it was improper procedure not to open the door for the examiner.

In any event, since Mrs. Bullock was the Manager of the Credit Union and one knowledgeable in Credit Union procedures, this policy decision was hers to make subject to direction from the Board of Directors. It is perfectly reasonable and logical that she would understand that Nate Palagi, as President, had no authority independent of the Board of Directors to order her to do something.

If Mrs. Bullock would not open the door, it could not possibly have serious effects on the Credit Union because Nate Palagi himself could have immediately opened the door if he felt that was the proper thing to do; or Mrs. Palagi, who was an employee of the Credit Union, could have been directed to open the door, which is, in fact, what happened.

Mrs. Bullock had worked all night. She was tired and ready to go to bed. Mrs. Bullock had received three (3) phone calls— two from Nate Palagi and one from Paula Neal. One person told her she did not have to open and one person told her that she did. How could she possibly be charged with misconduct under these circumstances? Mr. Palagi himself acknowledged that there was nothing in the policies of the Credit Union requiring Mrs. Bullock, after working the night, to come to work the next day. (Dept. of Employment Tr., Pg. 43, Lns. 10–13.)

Article VIII, Section 6 of the Credit Union By-Laws, explicitly stated that the manager would be under the direction and control of the board or of the treasurer as determined by the Board. Article XIX, Section 1 of those same By-Laws state:

"All power, authority, duties, and functions of the members, directors, officers, and employees of this credit union, pursuant to the provisions of these bylaws, shall be exercised in strict conformity with the provisions of applicable law and applicable regulations, and of the charter and the bylaws of this credit union."

How can the Credit Union adopt explicit By-Laws (of which Mrs. Bullock was very aware) and then try to claim that her exercise of discretion was wrong and considered misconduct?

As stated in Finding of Fact Number X, Claimant asserted that because the Credit Union was closed for business, it was not required to open its office for the examiner on July 6. This was not refuted in any way by any other evidence.

Any determination as to whether certain conduct disqualifies one from unemployment compensation benefits is a conclusion of law and, therefore, subject to review by this Court. *McGraw-Edison Co. v. Department of Industry, Labor and Human Relations,* 64 Wis.2d 703, 221 N.W.2d 677.

## V.

There is no justification in the record for that part of the referee's (Commission's) conclusion of law IV footnoted in the majority opinion which goes beyond the referee's agreement with the claimant that the president had not been delegated the authority to *direct* the claimant to open the office. Of course, as we were well informed, Mr. Palagi did *not* give her a direct order to open up, nor any kind of an order. He merely requested her to do what he himself could have done, and later had his wife do.

But the referee in the first instance, the Commission in the second, and a majority of the Court in the third instance, are not content to let the matter end there. It was said by the referee, see footnote 1 of the majority opinion, that the credit union was in a precarious financial state [no fault of the claimant's], and that "claimant was aware of the importance of establishing a good rapport with the examiner." [No responsibility of the claimant's.]

While I would not suggest that anyone should ever purposefully offend any federal employee, I would choose to think that the continued existence of this credit union depended on its financial condition being brought into line with federal standards, and not on how its manager might charm the examiner whose obligations are simply to independently audit the books.

Seeing nothing in this record to demonstrate that the actions of this claimant in any way prejudiced, or could have prejudiced, the credit union, I see this case much like *Comegys, supra*. *Comegys* was not decided in this Court until February 15, 1983, some time after the Commission entered its decision in this case. *Comegys* involved a direct written rule promulgated by the Idaho Air National Guard. Here, we have no rule, for which reason the decision of the Commission is less tenable than it was in that case. As Justice Shepard wrote in his plurality opinion, "No factual basis is stated therefor, such as the employer's reputation and good name were somehow injured or the conduct of its business was somehow made more difficult." *Comegys*, 104 Idaho at 768, 663 P.2d at 649. As Justice Huntley wrote separately, "there is no testimony whatsoever establishing any detriment to the Air National Guard caused by the issuance of the checks by Comegys.... The evidence presented does not meet the standards required by the authorities cited above for the denial of unemployment benefits." 104 Idaho at 769, 663 P.2d at 650. Such evidence is once again lacking. Instead we are furnished nothing but vapid theorizing as to what might have happened, but did not happen.

APPENDIX A

BEFORE THE INDUSTRIAL COMMISSION
STATE OF IDAHO

| | |
|---|---|
| PHILLIP E. COMEGYS,<br>SSA 478 38 5208 | )<br>)<br>) |
| Claimant, | )<br>) |
| vs. | )<br>) |
| IDAHO AIR NATIONAL GUARD, | )<br>) |
| Employer, | )<br>) |
| and | )<br>) |
| STATE OF IDAHO,<br>DEPARTMENT OF EMPLOYMENT. | )<br>)<br>) |

DoE 1169–80

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER

The Claimant in the above-entitled matter appealed the decision of an Appeals Examiner of the State of Idaho's Department of Employment which held that he was ineligible for unemployment benefits. The Commission entered its decision on December 30, 1980. That decision was appealed to the Idaho Supreme Court, which remanded the matter to the Commission.

A hearing was held before Commissioners Gerald A. Geddes and Lawrence G. Sirhall in Boise on September 7, 1983. The Claimant was present in person and he was represented by Howard A. Belodoff, Esq., and Carolyn S. Steele, Esq. Howard I. Manweiler, Esq., and Blair D. Jaynes, Esq., represented the employer. Roger T. Martindale, Esq., represented the Department of Employment. Both oral and documentary evidence were presented to supplement the previous record. After the hearing, briefs were filed and the matter was submitted for decision. Having reviewed the record, the Commission enters the following Findings of Fact, Conclusions of Law, and Order.

FINDINGS OF FACT

I

The Claimant was employed as a National Guard technician by the Idaho Air National Guard pursuant to 32 USC Section 709. He worked in the shipping and receiving department at Gowen Field. As a National Guard technician, the Claimant was an employee of the Federal Government. In order to be employed as a National Guard technician, it was required that the Claimant concurrently be a member of the Idaho Air National Guard. The Claimant rose to the rank of Master Sergeant in the Air National Guard.

II

The Claimant did not keep accurate records of the balance in his checking account, and in June and July of 1979, he wrote a number of checks which were returned because there were insufficient funds in his account. The Claimant attempted to straighten out the matter with his bank, but he was unable to reach a satisfactory agreement with the bank, so he closed his account. He left money in the account which he thought was sufficient to cover the outstanding checks. The Claimant opened another account at a different bank about one or two months later. As a result of inaccurate record keeping in about October of 1979, the Claimant again

wrote some checks which were returned due to insufficient funds.

### III

Two of the insufficient fund checks which the Claimant wrote in June and July of 1979 were payable to K-Mart. The amounts of those checks were $15.62 and $17.48. A K-Mart employee learned that the Claimant worked for the Air National Guard. In October of 1979, a K-Mart employee telephoned then-Major Blankinship, who was the Chief of Supply, the division in which the Claimant worked, and informed him about the check for $15.62.

### IV

The Departments of the Army and Air Force have published a pamphlet entitled "Standards of Conduct" for National Guard technicians which sets forth the rules that the technicians must follow. That pamphlet includes the following:

"**INDEBTEDNESS. 2–8.** National Guard technician shall pay each just financial obligation in a proper and timely manner, especially those imposed by law; such as Federal, State, or local taxes. For the purpose of this paragraph, a 'just' financial obligation means one acknowledged by the technician or reduced to judgment by a court. 'In a proper and timely manner' means in a manner that the agency determines does not, under the circumstances, reflect adversely on the Government as the technician's employer. In the event of a dispute between a technician and an alledged [sic] creditor, the agency will not attempt to determine the validity or amount of the disputed debt (app D)."

**Appendix D** "1. **General.** A primary purpose of the indebtedness standard is to protect the reputation of the National Guard and the credit reputation of its technicians..."

### V

After he was contacted by K-Mart, Blankinship met with the Claimant on or about October 23, 1979. At that time, Blankin-ship told the Claimant to take care of the check for $15.62. Until that time, the Claimant had been unaware that any K-Mart checks had been dishonored. The Claimant said that he would take care of them as soon as possible. The Claimant contacted K-Mart and informed a store employee that he would take care of the check as soon as he was able to. In October of 1979, the Claimant was having financial difficulties as a result of medical expenses that he and his wife incurred. He did not take care of the K-Mart check at that time.

### VI

K-Mart was in contact with Blankinship again and informed him about the check for $17.48. Blankinship met with the Claimant on November 10, 1979 and told the Claimant to take care of both of the K-Mart checks. The Claimant said that he would take care of them as soon as he was able to.

### VII

The Claimant had not taken care of the checks by January 4, 1980, when he met with Blankinship again. The Claimant informed Blankinship that he had contacted K-Mart and that he was trying to make arrangements to take care of the checks.

### VIII

In late February of 1980, Blankinship contacted K-Mart and learned that the Claimant had not taken care of the checks. On March 21, 1980, Blankinship prepared a letter to the Claimant stating that Blankinship proposed to suspend the Claimant for five days because of his failure to take care of the checks. The Claimant paid K-Mart for the two checks on April 3. On April 4 he showed Blankinship that they had been paid with the expectation that his five-day suspension scheduled to begin April 7 would be cancelled. However, the five-day suspension was not cancelled.

### IX

In about April of 1980, Blankinship's superiors asked him to find out if the Claim-

ant had written any other checks without sufficient funds. Blankinship telephoned several businesses near the K-Mart store and learned that some checks written by the Claimant had been turned over to a collection agency. Blankinship contacted the collection agency which sent him a list of fifteen checks which had been turned over to it for collection. The record includes copies of ten of those checks. Eight of the ten were written in June or July of 1979; the other two were written in about October of 1979. The total of the amounts on the fifteen checks was about $130.00.

## X

Blankinship met with the Claimant to discuss the list of checks from the collection agency. Until that time, the Claimant had been unaware that any of those checks had been dishonored. The Claimant subsequently made arrangements with the collection agency to pay the checks and the agency's fees at the rate of twenty dollars per month.

## XI

When he wrote some of the insufficient fund checks in June and July of 1979, the Claimant showed his military identification card. In addition, he gave his telephone number at Gowen Field when he wrote some of those checks.

## XII

The Idaho Air National Guard decided to discharge the Claimant from his civilian job as a National Guard technician because he wrote the checks with insufficient funds in his account. He was discharged on June 27, 1980. He remained a member of the Idaho Air National Guard until January of 1981, when he was honorably discharged.

## XIII

The Claimant filed a claim for unemployment benefits on about June 30, 1980.

## XIV

The Idaho Air National Guard's recruitment is satisfactory and, in the opinion of a worker in the personnel office there, the public's opinion of the National Guard is excellent. The record does not establish that the Claimant's writing of insufficient funds checks was detrimental to the operations of the Idaho Air National Guard.

## CONCLUSIONS OF LAW

### I

In order to be eligible for unemployment benefits, the claimant must meet the eligibility conditions of *Idaho Code*, Section 72–1366(e) which requires, in part, that

> "His unemployment is not due to the fact ... that he was discharged for misconduct in connection with his employment."

### II

In *Johns v. S.H. Kress & Co.*, 78 Idaho 544, 307 P.2d 217 (1957), the Supreme Court of Idaho interpreted the term "discharged for misconduct" as meaning the

> "... wilful, intentional disregard of the employer's interest; a deliberate violation of the employer's rules; or a disregard of standards of behavior which the employer has the right to expect of his employees."

### III

In the case at hand, the Claimant was discharged because he wrote a number of insufficient funds checks. Clearly, this was a violation of the employer's rules. However, as the Idaho Supreme Court stated in *Wroble v. Bonners Ferry Ranger Station*, 97 Idaho 900, 556 P.2d 859 (1976):

> "While an employer may make almost *any* kind of rule for the conduct of his employees, and under some circumstances, may be able to discharge an employee for violation of *any* rule, such does not, *per se*, amount to 'misconduct' constituting a bar to unemployment compensation benefits."

## IV

In this case, the National Guard's rules indicate that it's concern about employee's off-duty activities is motivated by its desire to maintain its reputation. The record indicates that the National Guard's reputation is excellent; the record does not establish that the Claimant's actions were detrimental to the National Guard. The Department of Employment argues that the efforts by National Guard personnel in dealing with the Claimant's insufficient funds check situation were time consuming and diverted them from their other activities. However, the record indicates that the National Guard voluntarily chose to spend the time pursuing the matter.

## V

The Department of Employment also argues that it is not necessary to establish actual harm to the employer, citing *O'Neal v. Employment Security Agency*, 89 Idaho 313, 404 P.2d 600 (1965). However, there is an important distinction between the *O'Neal* case and the present case. In the *O'Neal* case the Claimant's conduct was so heinous (O'Neal was convicted of a felony morals violation) that harm to the employer may be presumed. In this case, as a result of poor record keeping, the Claimant wrote seventeen insufficient funds checks whose total amount was about $165.00. For such a rule violation, harm to the employer cannot be presumed. The employer has the burden of establishing misconduct. *Parker v. St. Marie's Plywood*, 101 Idaho 415, 614 P.2d 955 (1980). The employer, having failed to establish that the Claimant's actions resulted in any harm to it, has failed to establish misconduct. The Claimant was discharged, but not for misconduct in connection with his employment, so he is eligible for unemployment benefits.

## ORDER

IT IS HEREBY ORDERED, and this does order, that the Decision of the Appeals Examiner be, and the same is hereby, REVERSED.

DATED and FILED this 26th day of January, 1984.

INDUSTRIAL COMMISSION
/s/ Will S. Defenbach
Will S. Defenbach, Chairman
/s/ Gerald A. Geddes
Gerald A. Geddes, Member
/s/ L.G. Sirhall
L.G. Sirhall, Member

ATTEST:

/s/ Patricia S. Ramey
Patricia S. Ramey, Secretary

Copies to:
Philip Comegys, 9897 Tudor, Boise, ID 83704
Idaho Legal Aid, P.O. Box 1683, Boise, ID 83701
Idaho Air National Guard, Attn: Blair D. Jaynes, Box 45, Boise, ID 83707
Department of Employment, 317 Main Street, Boise, ID 83720
RP/sw

## APPENDIX B

Bullock v. CIT Co. Federal Credit Union, No. 14812

Portion of oral argument heard March 6, 1984 in Pocatello, Idaho

MR. WEEKS: Mr. Chief Justice, members of the Court, counsel, may it please the Court, my name is Larry Weeks representing the Department of Employment and finding myself in sort of a unique situation here. The Department supports the claimant in this matter despite the fact that she has consistently been denied benefits at each of the four levels of review prior to this level. I'm going to argue today that the findings of fact by the Industrial Commission are incorrect and that this Court has authority to look behind those findings and to disregard them where appropriate and also that the conclusion and order were incorrect inasmuch as the claimant should have been granted benefits.

JUSTICE BAKES: Before you get to the merits, Mr. Weeks, I'd like you to explain, if you would, a little bit, this unique posi-

tion as you indicate you're in, because I could see if the Department had ruled— first, I'm not sure is that maybe the Department by statute is a party up here. It's little unusual to have someone who was acting as an administrative judge turn around and be a litigant before this on appeal. But that problem aside, the Department never awarded benefits to this individual which were overturned which might make you think you've got a proprietary interest that something is done. The Department, all the way through as I read this record, denied benefits. It's little unique that the Department, after having denied the benefits would come in and argue before this Court that the Industrial Commission, which affirmed your Department, was wrong. Now, could you explain a little how you get here and on what basis and what the purpose of your being here is?

JUSTICE BISTLINE: Before you get too far into it I might suggest, I hope you don't mind the interruption, that this has come up in varying contexts in the past and we've had some, I think, some very candid and helpful explanations·that the Department tries not to guide its personnel. It lets them act independently, because to an extent you are an arbiter and you're generally looking out for the state money. That's the thought that I've got out of it. You don't really take sides.

MR. WEEKS: Yes, let me try to defend my existence here. The Department does act, as I've explained in previous argument, as a trustee in this matter. The Department legal counsel, at any rate, do. Now the appeals bureau for the Department functions totally independently and legal counsel normally isn't·representing the Department at that level. They're a totally separate unit within the Department. They report directly to the director with none of the intermediate bureaucratic levels being involved. The Industrial Commission, of course, is a separate statutory entity altogether. I've not being totally inconsistent here today inasmuch my predecessor argued basically that the claimant should be awarded benefits at the Industri-

al Commission level. Her argument didn't prevail but she did argue in favor of awarding benefits. I think it's unique to be here in the sense that all these four levels have denied benefits to the claimant. However, I feel really strongly about this. I didn't represent the Department at the Industrial Commission level. However, I was convinced by the argument of my predecessor, Mrs. DeMeyer, that she was absolutely correct, that on the merits this was an isolated incident. Under the law, the claimant should be awarded benefits.

JUSTICE BAKES: So that I understand what you're telling me, that the legal advisors—I take it you're an assistant attorney general—

MR. WEEKS: Yes.

JUSTICE BAKES: —do the Department really operate independent of the Department and you form your own conclusions on these cases when they come to your attention and you're not necessarily taking the point of view of the Department itself, but you're taking the position as assistant attorney general attached to the Department, you're taking an independent view of the case. Is that essentially correct?

MR. WEEKS: That's precisely the case, Justice Bakes. We may form a preliminary opinion before we go into Industrial Commission hearings, but based upon additional evidence which is sometimes presented at that level, we may form an opinion totally independent of what an appeals examiner has found. And this happens, let me explain a little further, because normally at an appeals level within the Department, a claimant or an employer will not be represented by counsel. It certainly is required at that level and normally the claimant simply can't afford to have legal counsel unless it happens to be Legal Aid. This is an exception to that. When it gets to the Industrial Commission level they usually discover that they need an attorney to respond to the requests for hearing and what additional evidence they need to present. That's the whole purpose, I think, of the Industrial Commission level hearing, is—

JUSTICE HUNTLEY: Excuse me, I thought I understood your position until you answered Justice Bakes' last question. The first time you answered the question you said that the Department and the appeals division are too separate things for the purpose of this kind of a case.

MR. WEEKS: That's correct.

JUSTICE HUNTLEY: You represent the Department and you do not, necessarily, take the same position as the appeals division of it.

MR. WEEKS: That's correct.

JUSTICE HUNTLEY: That was your first answer. Now, your second answer seems to be you're not representing the Department but you're taking an attorney general's position. Now, which is it?

MR. WEEKS: Well, I may have misspoke myself. I do represent the Department. I'm paid by the Department. What I'm saying is that we're in the kind of enviable position within the legal staff of being able to adopt an independent decision on the merits based upon our reading of the facts and of the law itself.

JUSTICE HUNTLEY: It's similar to what we have at the PUC where we have the Commission and then we have the Commission staff.

MR. WEEKS: I think it's analogous to that, yes.

JUSTICE SHEPARD: But the difference, it seems to me, Mr. Weeks, is that you are not a staff member, you are a lawyer, right?

MR. WEEKS: That's correct Justice Shepard.

JUSTICE SHEPARD: You represent a client?

MR. WEEKS: Correct.

JUSTICE SHEPARD: The Department of Employment.

MR. WEEKS: Right.

JUSTICE SHEPARD: And you're here advocating against the Department's position, if not interest.

JUSTICE HUNTLEY: Against the Department's appeals division.

MR. WEEKS: Yes, certainly that's the case. And I know that seems strange, but that's the posture of the procedure that we have within the Department up to this level.

JUSTICE BAKES: Well, so that I understand what you're telling me, are you here saying that you are representing the independent view of the attorneys assigned by the attorney general and giving your independent view, or are you here representing what you think the Department of Employment's view is because it seems to be inconsistent with the action which the Department itself took. Now, I get the impression that, because of the arrangement that you have, you're permitted the liberty to take a position independent of the position which the Department itself might take and to advocate that position as the case proceeds through the Administrative Procedure and finally into the courts.

MR. WEEKS: That's correct, Justice Bakes. Basically, there isn't a real legal proceeding until it gets to the Industrial Commission level. The prior three levels— the first two are simply done by an employee in the local office who makes a determination and a redetermination. At the appeals level, those appeals are not conducted by attorneys, although they are employees who have been trained in the law to a certain extent and have a great deal of experience. Now, because of the immense number of appeals it would be virtually impossible for us as legal counsel to be present at each of those, unless we're notified that it's an interesting case from a sense that it may be a tax situation that they want some advice on. So, we may provide briefing and argument at that level. But that's the exception rather than the rule. We seldom do not appear at an Industrial Commission hearing, however. And as I pointed out, counsel for the Department did argue in the same posture that I am today—that the plaintiff should be awarded benefits. So, it's not inconsist-

ent from that perspective, I guess, when it gets to that level.

JUSTICE BAKES: It seems to me that your position is somewhat akin to that of the Attorney General for the United States who does not necessarily represent the views of a particular agency of the United States, in fact often, as he goes before the—or the solicitor general before the Supreme Court of the United States. They may be two different entities with opposite points of view and the attorney general or the solicitor represents a broader view called the position of the United States which may be different than the position for the Department of Interior or the Department of Labor or some—because of this higher duty. Now, when you come here saying I'm representing the Employment Department, it seems to me that you ought to be representing the people who took the position in the Employment Department but if you're here representing, say the State of Idaho, which maybe has a broader view of this thing, as represented through the attorney general's office, I could understand that. But when you come saying I represent the Employment Department, I see the Department was arguing the other way. It seems to me it puts you in kind of an awkward position.

MR. WEEKS: Yes, it does. And that's why I mentioned it up front.

JUSTICE BISTLINE: I think it puts him in an admirable position, because back of it all, I keep in mind what you say is that the Department's policy should be to see that people who are entitled to benefits get them and that public moneys don't go to people who aren't entitled to them. And that is what you say is primarily your job and employees that haven't got legal training, and even if they don't have enough, they might not be able to fulfill that obligation. I think you're in a commendable position.

MR. WEEKS: Thank you, that's exactly my argument.

JUSTICE DONALDSON: Would you like to get down to your main argument before your time has expired?

MR. WEEKS: Well, in my last 30 seconds here, basically I'd like to refer the Court to my brief wherein I argue that, of course, the Court knows what its scope of review is in these matters under the Idaho Constitution, and normally we urge that the findings of fact by the Industrial Commission be affirmed by the Supreme Court, I'm arguing in this case that the record simply doesn't indicate and doesn't justify the findings by the referee which were adopted without reviewing the transcript at the Commission level by the Commissioners themselves. Once again, I cannot explain why the third commissioner did not sign the decision. I've asked them several times why that is and they simply state, well he could have been sick, he could have been gone for some other reason, or maybe he didn't agree. So, it's their system and I can't really advise them beyond what to do with that sort of signature situation.

JUSTICE SHEPARD: Mr. Weeks, you've indicated that you agree with Mr. George's argument that the Commission did not review the record. Can you assure the Court of that?

MR. WEEKS: I find it impossible for the Commission to have reviewed the second transcript, the one from the Industrial Commission hearing simply because as Justice Bistline pointed out, the dates simply wouldn't fit here. The transcript is usually not prepared at that level until an appeal is taken to the Supreme Court or someone requests the transcript for some other reason.

JUSTICE SHEPARD: There was no electronic recording that they could have . . .

MR. WEEKS: I wasn't at the hearing, I don't know if there was an electronic recording, certainly there was a stenographer, and I have no idea whether that would have been read back to the commissioners. I would be, I think, surprised if it were.

JUSTICE SHEPARD: Would it be surprising to you if the Commission had listened to an electronic recording?

MR. WEEKS: It would not be as surprising as if I had been told that they had had the stenographer come in and read back the stenographic notes.

JUSTICE SHEPARD: If there had been an electronic device there, Mr. George has indicated that his recollection of the hearing before the referee was stenographically recorded so that if there was an electronic recording they would have been foolish to have had the stenographer read it back to them.

MR. WEEKS: We have no knowledge as to whether there was or wasn't an electronic recording. Yes, I have no direct knowledge of that so I can only speculate.

JUSTICE SHEPARD: Thank you.

MR. WEEKS: Perceiving that my time is just about up I would direct the Court's attention to two cases decided by this Court which are similar on the facts and in which this Court did disregard the findings of the Industrial Commission. One that's very similar and fairly recent in 1976 is Avery v. B & B Rental Toilets, an indelicately titled case but none the less the facts are rather similar. In that case the employee was discharged. That case is found at 97 Idaho 611. The employee was discharged because he had had an argument with his employer regarding the length of his work week and how many hours he was going to work. This Court held that it was not insubordination inasmuch that an employer cannot expect that an employee will always be absolutely docile or servile. I think that on the facts we have in the case here, we have an employer with 11 years experience as manager of a credit union who is as the case would indicate, dealing with a board who are basically amateurs in regard to actually running the day to day operations of the credit union and I think given the circumstances of her having worked all night it has to be considered an isolated incident, and I think that the finding in Avery should control. The similar case is entitled Garrow v. Idaho State School & Hospital, found at 95 Idaho 817. In that case a state employee was asked to work outside of his job description, refused, and was fired by the administration of the school. This Court in very brief opinions, simply said that the findings do not support the conclusion and that the findings were not based upon substantial and competent evidence which of course is the standard here, and reversed the decision. I think that those two cases are highly significant in regard to the factual situation we have before the Court today. And in regard to that I have nothing further to add as far as the legal framework for the Court's action.

JUSTICE SHEPARD: Do you feel that they used the proper legal definition of misconduct?

MR. WEEKS: In this particular case?

JUSTICE SHEPARD: Yes.

MR. WEEKS: No I don't. No I don't. I think they completely went outside of the Johns definition which they cited in the decision. I don't think that this factual situation in any way rises to the level of misconduct that was contemplated in Johns and its progeny.

JUSTICE BAKES: But that's a factual question isn't it. I mean if you say there wasn't sufficient evidence to sustain it, but I guess the question Chief Justice Donaldson asked is didn't they apply the right law even though they may have, in your opinion, wrongly said these facts fit it?

MR. WEEKS: Oh yes, I may have misunderstood Chief Justice, the Johns definition is the one that should be applied, yes. They're looking at the right area of law, but I think they've misapplied the factual situation.

C.J. DONALDSON: I believe that's all. Thank you.